PATIENCE DRAKE ROGGENSACK, J.
¶ 1. This appeal arises from a judgment of the Dane County Circuit Court[1] granting declaratory and injunctive relief based on the circuit court's conclusion that 2011 Wis. Act 23, Wisconsin's voter photo identification act, violates the Wisconsin Constitution.
¶ 2. Plaintiffs challenge Act 23 under Article III, Section 1 of the Wisconsin Constitution.[2] They contend that the law is invalid because "it would severely burden *475 a significant number of qualified voters but [is] not reasonably necess[ary] or designed to deter fraud or otherwise effect an important government interest." Plaintiffs identify burdens of time, inconvenience and costs associated with Act 23. Emphasizing the difficulties that facial challenges to a statute bear, defendants contend plaintiffs have not shown that Act 23 is anything more than a reasonable, election-related regulation or that the law's requirements amount to a denial of the right to vote.
¶ 3. We conclude that plaintiffs have failed to prove Act 23 unconstitutional beyond a reasonable doubt. In League of Women Voters of Wisconsin Education Network, Inc. v. Walker, 2014 WI 97, 357 Wis. 2d 360, 851 N.W.2d 302, also released today, we concluded that requiring an elector to present Act 23-acceptable photo identification in order to vote is not an additional elector qualification. Id., ¶ 57. In the present case, we conclude that the burdens of time and inconvenience associated with obtaining Act 23-acceptable photo identification are not undue burdens on the right to vote and do not render the law invalid.
¶ 4. We conclude, as did the United Stated Supreme Court in Crawford v. Marion County Election Board, 553 U.S. 181 (2008), that "the inconvenience of making a trip to [a state motor vehicle office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote." Id. at 198. Furthermore, photo identification is a condition of our times where more and more personal interactions are being modernized to require *476 proof of identity with a specified type of photo identification. With respect to these familiar burdens, which accompany many of our everyday tasks, we conclude that Act 23 does not constitute an undue burden on the right to vote. Payment to a government agency, however, is another story.
¶ 5. Act 23 provides that the Department of Transportation (DOT) "may not charge a fee to an applicant for the initial issuance, renewal, or reinstatement of an identification card" when "the applicant requests that the identification card be provided without charge for purposes of voting." Wis. Stat. § 343.50(5)(a)3. (2011-12).[3] On its face, then, the law prohibits a government or its agencies from requiring any elector, rich or poor, to pay a fee as a condition to obtaining a DOT photo identification card to vote.[4] See Harper v. Va. Bd. of Elections, 383 U.S. 663, 666 (1966) ("payment of any fee [may not be] an electoral standard"). The mandate of Act 23 is consistent with the Wisconsin tradition of "jealously guarding] and protecting]" the fundamental right to vote. See State ex rel. Frederick v. Zimmerman, 254 Wis. 600, 613, 37 N.W.2d 473 (1949).
¶ 6. Plaintiffs produced evidence at trial that, in the course of obtaining a DOT photo identification card for voting, government agencies charged them fees to obtain supporting documents for their applications. A common example is a birth certificate, which is satis *477 factory proof of name, date of birth and citizenship, and can cost $20 to obtain. E.g., Wis. Stat. § 69.22(l)(a) and (c). The requirement for such documents arose under Wisconsin administrative rules that implement Act 23. E.g., Wis. Admin. Code § Trans 102.15(3)(a).
¶ 7. In order to resolve the conflict between Act 23 and Wis. Admin. Code § Trans 102.15(3)(a), we interpret the administrative rules and explain that the discretion of the Division of Motor Vehicles (DMV) administrators must be exercised in a constitutionally sufficient manner. Such exercise of discretion requires the issuance of DOT photo identification cards for voting without requiring documents for which an elector must pay a fee to a government agency.[5] See Wis. Admin. Code § Trans 102.15(3)(b) and (c) (permitting issuance of DOT photo identification cards for voting without the documents described in § Trans 102.15(3)(a)). Our conclusion employs a saving construction of § Trans 102.15(3)(b), conforms to Act 23's mandate and relieves a severe burden on the right to vote that would otherwise exist. Because with a saving construction of § Trans 102.15(3)(b) Act 23 does not place a severe burden on *478 the right to vote, we apply rational basis scrutiny and conclude that Act 23 is reasonably related to the State's significant interests.
¶ 8. We have been mindful that the task before us is not to determine whether "Act 23 is the best way to preserve and promote the right to vote." League of Women Voters, 357 Wis. 2d 360, ¶ 55. Such "policy determinations . . . are not properly addressed to the members of the Supreme Court of Wisconsin." MTI v. Walker, 2014 WI 99, ¶ 181, _ Wis. 2d _, 851 N.W.2d 337 (Crooks, J., concurring).
¶ 9. Instead, we apply judicial restraint and constitutional principles to the case at hand. Accordingly, we reverse the judgment of the circuit court and vacate the injunctions the circuit court issued.
I. BACKGROUND
A. Parties
¶ 10. Plaintiffs are the Milwaukee Branch of the NAACfi Voces de la Frontera and numerous individuals residing either in Milwaukee County or in Polk County. The NAACR an incorporated association with its business address in the City of Milwaukee, contends that "Act 23 will force the Milwaukee Branch of the NAACP to divert substantial resources away from traditional voter registration and voter turnout efforts in order to educate and assist voters in procuring Act 23-acceptable photo ID." NAACP alleges that Act 23 unconstitutionally burdens Wisconsin African-American residents' right to vote.
¶ 11. Voces is Wisconsin's preeminent immigration rights organization. It expresses strong concerns about the burden Act 23 will place on the Latino community and its members as they seek to exercise *479 their franchise. Voces alleges that "Act 23 will force Voces to divert substantial resources away from traditional voter registration and voter turnout efforts in order to educate and assist voters in procuring Act 23-acceptable photo ID."
B. Act 23
¶ 12. Act 23, with a few limited exceptions, requires electors to identify themselves by presenting Act 23-acceptable photo identification in order to vote. Stated generally, these include: DOT issued driver's license; DOT issued photo identification card; an unexpired DOT photo identification card receipt; United States uniformed service identification card; United States passport; United States naturalization certificate issued within two years preceding the election; federally recognized Wisconsin Native American tribe's identification card; Wisconsin university or college student identification card; and citation or notice of driver's license suspension. Wis. Stat. § 5.02(6m). Our review focuses on the second form of acceptable identification, which we refer to as a DOT photo identification card for voting. See Wis. Stat. § 343.50.
¶ 13. The DMV is the division of the DOT charged with issuing DOT photo identification cards for voting spoken to in Act 23. DOT administrative rules governing DMV's process for issuing these cards require an applicant to document name, birth date, identity, residence and citizenship. A social security card and numerous other documents are proof of identity. Wisconsin Admin. Code § Trans 102.15(4)(a)13. An applicant may prove residence by items such as a utility bill, paycheck stub or similar document that shows name and address. § Trans 102.15(4m).
*480 ¶ 14. A certified copy or an original birth certificate is satisfactory proof of name, date of birth and citizenship. Wis. Admin. Code § Trans 102.15(3)(a). Wisconsin Stat. § 69.21 describes how to obtain vital records, including certified copies of birth certificates, for those applicants born in Wisconsin. Wisconsin Stat. § 69.22(l)(a) and (c) permit a government agency to assess a $20 fee for a certified copy of a birth certificate.[6] Other states presumably have their own procedures, which may similarly allow a government agency to charge a fee.
C. Procedural History
¶ 15. On March 6, 2012, the circuit court temporarily enjoined the enforcement of Act 23. On April 16-19, April 30, and May 4, 2012, the court conducted a bench trial. During the trial, plaintiffs testified about the burdens of time and inconvenience of going to DMV offices to obtain Act-23 acceptable identification. They also testified about the cost of documents the DMV requires in order to issue a DOT photo identification card for voting. These costs included payment to government agencies in various states, including Wisconsin, to secure a certified copy of a birth certificate.
¶ 16. On July 17, 2012, the circuit court declared Act 23's photo identification requirements unconstitutional, and granted permanent injunctive relief. The circuit court reasoned that "[t]he cost and the difficulty *481 of obtaining documents necessary to apply for a DMV Photo ID is a significant burden upon the opportunity of Wisconsin citizens to vote." It further concluded that these burdens "constitute a substantial impairment of the right to vote" and are therefore "inconsistent with, and in violation of Article III, Section 1 of the Wisconsin Constitution."
¶ 17. The circuit court made extensive findings of fact. For example, the court found that 80 percent of Wisconsin voters had a DOT-issued driver's license, which is an Act 23-acceptable identification, but that there were potentially thousands of otherwise qualified voters who currently lack Act 23-acceptable identification. The court made no finding of how many of those otherwise qualified voters could not obtain Act 23-acceptable identification. The court found that two electors, Ruthelle R. Frank and Ricky T. Lewis, had not secured photo identification cards due to problems in obtaining corrected birth certificates. The court also found that obtaining a certified copy of a birth certificate required payment to a government agency.
¶ 18. On November 20, 2013, after briefing was completed in the court of appeals and pursuant to Wis. Stat. § 809.61 and Wis. Const. Art. VII, § 3(3), we took jurisdiction of the appeal on our own motion.[7]
*482 II. DISCUSSION
¶ 19. Plaintiffs bring a facial challenge to Act 23 under the Wisconsin Constitution, arguing that the time, inconvenience and costs incurred in obtaining Act 23-acceptable photo identification impermissibly burden their right to vote. Plaintiffs do not assert that the actual presentation of photo identification violates their constitutional right to vote. Therefore, their challenge is made on a different legal basis than that of the plaintiffs in League of Women Voters.
¶ 20. Defendants maintain that Act 23 is constitutional. They argue that the burdens imposed on electors to obtain a DOT photo identification card are minimal when compared to the State's significant interest in protecting the integrity and reliability of the electoral process, in maintaining public confidence in election results and in preventing voter impersonation fraud.
*483 A. Standard of Review
¶ 21. Plaintiffs bring a facial challenge to Act 23. A facial challenge presents a question of law that we review independently, but benefitting from the discussion of the circuit court. Custodian of Records for the Legislative Tech. Servs. Bureau v. State, 2004 WI 65, ¶ 6, 272 Wis. 2d 208, 680 N.W.2d 792; State v. Wood, 2010 WI 17, ¶ 15, 323 Wis. 2d 321, 780 N.W.2d 63. Because this appeal follows a trial to the circuit court, we will uphold that court's historic findings of fact unless they are clearly erroneous. State v. Arias, 2008 WI 84, ¶ 12, 311 Wis. 2d 358, 752 N.W.2d 748.
¶ 22. If we conclude that a voter regulation creates a severe burden on electors' right to vote, we will apply strict scrutiny to the statute, and conclude that it is constitutional only if it is narrowly drawn to satisfy a compelling state interest. See Wagner v. Milwaukee Cnty. Election Comm'n, 2003 WI 103, ¶ 77, 263 Wis. 2d 709, 666 N.W.2d 816; see also Milwaukee Cnty. v. Mary F.-R., 2013 WI 92, ¶ 35, 351 Wis. 2d 273, 839 N.W.2d 581. On the other hand, if we conclude that the burden on the electors' right to vote is not severe, the legislation will be presumed valid, and we will apply a rational basis level of judicial scrutiny in determining whether the statute is constitutional. Mary F.-R., 351 Wis. 2d 273, ¶ 35.
B. Challenge to Act 23 Burdens
1. Foundational principles
¶ 23. Without question, the right to vote is a fundamental right and in many respects, it is protective of other rights. Frederick, 254 Wis. at 613; Clingman v. *484 Beaver, 544 U.S. 581, 599 (2005). As Justice Brennan explained so long ago, "the right to vote is 'a fundamental political right, because [it is] preservative of all [other] rights.' " Storer v. Brown, 415 U.S. 724, 756 (1974) (Brennan, J, dissenting) (quoting Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886)).
¶ 24. Foundational legal principles are our starting point when fundamental rights are at issue. One such principle is that generally, statutes are presumed to be constitutional. Tammy W-G. v. Jacob T., 2011 WI 30, ¶ 46, 333 Wis. 2d 273, 797 N.W.2d 854. However, the way in which we address this presumption may vary depending on the nature of the constitutional claim at issue. See League of Women Voters, 2014 WI 97, ¶ 16, 357 Wis. 2d 360. The presumption of constitutionality is based on the court's respect for a co-equal branch of government, and it is meant to promote due deference to legislative acts. Dane Cnty. Dep't of Human Servs. v. Ponn P, 2005 WI 32, ¶ 16, 279 Wis. 2d 169, 694 N.W2d 344. In addition, given a choice of reasonable interpretations of a statute, we must select the interpretation that results in constitutionality. Am. Family Mut. Ins. Co. v. DOR, 222 Wis. 2d 650, 667, 586 N.W.2d 872 (1998).
¶ 25. One who challenges a statute on constitutional grounds has a very heavy burden to overcome. Dowhower v. W. Bend Mut. Ins. Co., 2000 WI 73, ¶ 10, 236 Wis. 2d 113, 613 N.W.2d 557. To succeed, the challenger must prove that the statute is unconstitutional beyond a reasonable doubt. State v. Cole, 2003 WI 112, ¶ 11, 264 Wis. 2d 520, 665 N.W.2 328. While this burden of proof is often associated with the requisite proof of guilt in a criminal case, in the context of a *485 challenge to the constitutionality of a statute, the phrase "beyond a reasonable doubt" expresses the "force or conviction with which a court must conclude, as a matter of law, that a statute is unconstitutional before the statute or its application can be set aside." Ponn P, 279 Wis. 2d 169, ¶ 18. Furthermore, courts must resolve any doubt about the constitutionality of a statute in favor of upholding the statute. Monroe Cnty. Dep't of Human Servs. v. Kelli B., 2004 WI 48, ¶ 16, 271 Wis. 2d 51, 678 N.W.2d 831.
2. Voter rights
¶ 26. When courts approach constitutional challenges that allege a burden on the right to vote, we focus first on how the right is burdened. The analysis by which we do so is more nuanced than that set out above. Decisions of the United States Supreme Court, as well as our own decisions that relate to voting, provide discussions helpful to determining how to structure our examination of the plaintiffs' claims and the circuit court's conclusions.
¶ 27. For example, in Anderson v. Celebrezze, 460 U.S. 780 (1983), the Supreme Court examined whether an Ohio statute's requirement that an independent candidate for President file his statement of candidacy and nominating petition more than five months before party candidates were required to file, placed an unconstitutional burden on voting and associational rights of the candidate's supporters under the First and Fourteenth Amendments. Id. at 786 n.7, 790-91.
¶ 28. The Supreme Court began by noting that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany *486 the democratic processes." Id. at 788 (quoting Storer, 415 U.S. at 730). The Court then explained that voter regulation laws "inevitably affect[] — at least to some degree — the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." Id.
¶ 29. The Court said that there was no "litmus-paper test" that can separate valid from invalid voting regulations. Id. at 789. Instead, a court must first consider "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Id. The Court analyzed the facts supporting the alleged burdens on supporters of independent candidates and concluded that "[t]he inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity." Id. at 793 (citation and internal quotation marks omitted).
¶ 30. The Court then took up the precise interests identified by the State: "voter education, equal treatment for partisan and independent candidates, and political stability," and examined the "legitimacy" of the stated interests and the extent to which the early filing deadline served those interests. Id. at 796. The Court concluded that given modern communications, particularly those that occur in presidential elections, it was not clear that the early filing requirement aided voter education. Id. at 798. The Court also concluded that there was "no merit in the State's claim that the early *487 filing" assisted in treating partisan and independent candidates equally. Id. at 799.
¶ 31. Nowhere in the majority opinion did the Court describe whether it was applying rational basis or strict scrutiny to the Ohio statute. Rather, the Court seemed to balance the burden on the individual's First and Fourteenth Amendment rights with the specific interests the State sought to promote. However, it is important to note that although the law directly limited how one could become a nonpartisan candidate, it was the indirect restriction on the voters' right to have a choice of candidates that drove the Court's decision.
¶ 32. In Burdick v. Takushi, 504 U.S. 428 (1992), another case related to burdens on the right to vote, the Supreme Court continued to focus its discussion on the rights being burdened. There, Hawaii's lack of a provision to permit write-in voting was challenged as an impermissible burden on First and Fourteenth Amendment protections. Because only one candidate filed nomination papers for a state legislative seat, the petitioner wanted to mount a write-in campaign and was told that Hawaii made no provision for write-in candidates. Id. at 430.
¶ 33. As the Court began its discussion, it explained that "Petitioner proceeds from the erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny. Our cases do not so hold." Id. at 432. The Court instructed that only "severe restrictions" by the State would require a compelling state interest and that "reasonable, nondiscriminatory" regulations were permissible. Id. at 434.
¶ 34. The Court concluded that the burden imposed by Hawaii's lack of a provision for write-in voting was "slight"; therefore, the State "need not establish a *488 compelling interest to tip the constitutional scales in its direction." Id. at 439. The Court then applied rational basis scrutiny and concluded that "[t]he State has a legitimate interest. . . and the write-in voting ban is a reasonable way of accomplishing this goal." Id. at 440.
¶ 35. In Crawford, the Supreme Court decided a challenge to Indiana's statutory requirement that an elector identify himself by presenting a government-issued photo identification in order to vote. Crawford, 553 U.S. at 185. The complainants, who represented among others, "groups of elderly, disabled, poor, and minority voters," alleged that the law "substantially burdens the right to vote in violation of the Fourteenth Amendment" and that it will "arbitrarily disfranchise qualified voters who do not possess the required identification and will place an unjustified burden on those who cannot readily obtain such identification." Id. at 187.
¶ 36. In upholding the constitutionality of the Indiana statute, six members of the Court applied the Burdick/Anderson analysis, although the lead opinion, authored by Justice Stevens, and the concurrence, authored by Justice Scalia, applied the analysis somewhat differently. In the first step of that analysis, six justices examined whether requiring a government issued photo identification burdens the right to vote. Id. at 189-90; id. at 204 (Scalia, J., concurring). The lead opinion concluded that the requirement did not impose "excessively burdensome requirements on any class of voters" and that "the statute's broad application to all Indiana voters . .. imposes only a limited burden on voters' rights." Id. at 202-03 (citations and internal quotation marks omitted). The concurrence evaluated and upheld a single burden that was uniformly imposed on all voters, without regard to classifications of voters *489 and took issue with the lead opinion's consideration of "class of voters." Id. at 205 (Scalia, J., concurring).
¶ 37. Given that the burdens imposed were not "severe," both the lead opinion and the concurrence applied rational basis scrutiny in determining that the law was reasonably related to the State's legitimate interests and therefore, upheld the photo identification law. Id. at 204; id. at 209 (Scalia, J. concurring).
¶ 38. In Wagner, a Wisconsin case affecting voting, we applied the Burdick/Anderson burden analysis to a constitutional challenge to an enforced delay in becoming a candidate. Wagner, 263 Wis. 2d 709, ¶¶ 1, 76. Judge Wagner claimed a deprivation of "liberty and equal protection of the law" under both the Wisconsin Constitution and the United States Constitution brought about by the enforced delay of his opportunity to be a candidate for a non-judicial office during the judicial term for which he had been elected.[8] Id., ¶ 76.
¶ 39. We began by first considering "the character and magnitude of the asserted injury to the rights protected." Id., ¶ 77 (quoting Anderson, 460 U.S. at 789). We then considered the "legitimacy and strength" of the State's specifically identified interests, that of maintaining the integrity and independence of the judiciary. Id., ¶ 83. In so doing, we imported the United States Supreme Court's method of focusing first on the burden placed on a right related to voting and from that *490 determination, deciding what level of judicial scrutiny would be required. After concluding that the burden on the right to become a candidate was not severe, we applied rational basis scrutiny to the challenged limitation and concluded that the State's significant interest supported the delay. Id., ¶¶ 84-85.
C. Burdens of Act 23
¶ 40. We structure our discussion of plaintiffs' challenges to Act 23 consistent with the method of analysis employed in Burdick and Anderson, as we did in Wagner, where the challenge related to when a candidate could be submitted for voters' consideration and how the protections of both the Wisconsin Constitution and the United States Constitution were implicated. Id., ¶ 76. Accordingly, we first consider whether the burden on the right to vote is severe.[9] We begin by examining whether the time and inconvenience of going *491 to DMV offices to secure DOT photo identification cards for voting is a severe burden. We then consider whether payments for transportation to DMV offices and for documents that DMV has required before it would issue the requested photo identification cards are severe burdens on the exercise of the franchise. Finally, we consider the precise interests identified by the State for enacting Act 23.
1. Time/Inconvenience
¶ 41. The record provides extensive testimony about trips to DMV offices by individuals who sought to obtain Act 23-acceptable photo identification for voting. Some of these trips were at quite a distance and many trips were repeats because either the line to obtain a photo identification card was too long or the applicant did not have the documents that DMV required in order to issue a photo identification card. Some witnesses testified that they had spent in excess of six hours in their efforts.
¶ 42. No one who testified thought the process of obtaining a DOT photo identification card was easy. However, all were successful, except two applicants, Ruthelle R. Frank and Ricky T. Lewis. They were unable to obtain photo identification cards because of problems with their birth certificates that may require court action to correct.
*492 ¶ 43. Few cases have parsed the constitutional significance of time and inconvenience burdens on the right to vote. However, Crawford did, to some extent, when it considered the burden that "life's vagaries" can impose and noted that:
[a] photo identification requirement imposes some burdens on voters that other methods of identification do not share. For example, a voter may lose his photo identification, may have his wallet stolen on the way to the polls, or may not resemble the photo in the identification because he recently grew a beard.
Crawford, 553 U.S. at 197. Crawford also went on to explain that "the inconvenience of making a trip to [a state motor vehicle office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." Id. at 198. We agree with that assessment.
¶ 44. Moreover, we note that photo identification is, to some extent, a condition of our times. Many important personal interactions are being modernized to require proof of identity with photo identification. For example, years ago, driver licenses did not require a photograph of the licensee, now Wisconsin driver licenses do. Photo identification is now required to purchase a firearm, to board a commercially operated airline flight, to enter some federal buildings and to obtain food stamps. Photo identification is often required to obtain a book from a public library, to cash a check, to purchase alcoholic beverages, to be admitted to many places of employment and to be seen by one's own physician for a personal appointment. Elector *493 identification is certainly as important an identification as any of the above examples.
¶ 45. The federal government also has directed states to require photo identification in circumstances where the federal government was not involved in the past. For example, the REAL ID Act of 2005, Pub.L. 109-13, sets forth requirements for state driver licenses wherein underlying documents are required to obtain or renew a driver's license in a state that has implemented the REAL ID Act, as Wisconsin has.[10] See, e.g., Wis. Stat. § 343.165. As inconvenient as it may be, photo identification is here to stay. It is a fact of life to which we all have to adjust.
¶ 46. We do not minimize the difficulties that some who applied for Act 23-acceptable photo identification have encountered in the past or will encounter in the future. However, the time and inconvenience incurred are not severe burdens on the right to vote. In many cases, these familiar burdens are no more of an imposition than is the exercise of the franchise itself, which can involve waiting in long lines and traveling distances in order to personally cast a ballot on election day.[11]
¶ 47. In addition, we note that the NAACP and Voces are two of Wisconsin's most conscientious and *494 capable organizations in regard to encouraging and facilitating voting. They will know what documentation DMV requires to issue DOT photo identification cards for voting and will work to assure that members of the African-American and Latino communities will be well prepared for their trips to DMV NAACP and Voces have seen the power that the voting booth can give to their communities and will continue to work to assure that all eligible voters have the opportunity to exercise their franchise.
¶ 48. The Government Accountability Board (GAB) also is poised to assist in educating the electors about how to obtain a DOT-issued photo identification card. The GAB received legislative approval for a $1.9 million appropriation to implement Act 23 and to educate Wisconsin voters on where and how to obtain Act 23-acceptable photo identification. Although some of these efforts have been put on hold due to circuit court injunctions, the GAB remains a significant resource for information and education.
2. Costs
¶ 49. We now turn to the other burden that the plaintiffs identified and the circuit court found, which are the costs incurred in obtaining a DOT-issued photo identification card for voting. Some costs involved payments for transportation to DMV offices or time taken from work. They are not costs paid to a government agency nor are they regulated by Act 23. In some respects, they are similar to those costs incurred in casting an in-person ballot. They are not a severe burden on the right to vote.
¶ 50. Plaintiffs also provided evidence of payments to government agencies to obtain documents required by DMV to issue DOT photo identification *495 cards to vote. Plaintiffs do not employ the term "poll tax" in regard to those payments and we do not define them as poll taxes. Plaintiffs assert, however, that those payments are an unconstitutional burden on the right to vote. Because other jurisdictions have characterized payments to government agencies to obtain documents necessary to voting as a de facto poll tax and because there are compelling reasons to assure that Wisconsin does not impose an unconstitutional fee as a condition of voting, we interpret Act 23 with both characterizations in mind.
¶ 51. Act 23 provides that DOT "may not charge a fee to an applicant for the initial issuance, renewal, or reinstatement of an identification card" when "the applicant requests that the identification card be provided without charge for purposes of voting." Wis. Stat. § 343.50(5)(a)3. This provision prohibits DOT from causing any elector, rich or poor, to pay a fee as a condition to voting.
¶ 52. However, plaintiffs incurred costs due to payments to government agencies for documents that DMV required in order to issue DOT photo identification cards for voting. These costs were not paid to DOT or its division, DMV; they were paid to other government agencies. One example of such a cost is the payment for certified copies of birth certificates that DMV has required as proof of name, date of birth and citizenship.[12] See Wis. Stat. § 69.22.
¶ 53. Payments required to be made to a Virginia government agency in order to exercise the right to vote were held unconstitutional in Harper, where a $1.50 poll tax was examined. The Supreme Court concluded *496 that "payment of any fee" to a Virginia government entity could not be required as a condition of voting. Harper, 383 U.S. at 666. Although the Court talked about the uneven impact such a fee may have on those with limited financial resources, the Court struck down the fee for all voters. Id.
¶ 54. More recently, state supreme courts have examined claims that fees paid to state agencies to obtain documents required as part of the application process for state photo identification cards violated electors' constitutional rights. For example, in In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71, 740 N.W.2d 444 (Mich. 2007), the Michigan Supreme Court considered a facial challenge to a Michigan statute that required potential voters to identify themselves with a government-issued photo identification card. Id. at 451. As part of its discussion, the court examined whether ancillary charges for documents necessary to obtaining the required photo identification card operated as a de facto poll tax that violated the Michigan Constitution or United States Constitution. Id. at 463-66.
¶ 55. In concluding that the Michigan statute was not a de facto poll tax, the court explained:
[T]he statute does not condition the right to vote on the payment of any fee. A voter who does not otherwise possess adequate photo identification is not required to incur the costs of obtaining photo identification as a condition of voting. Instead, a voter may simply sign an affidavit in the presence of an election inspector. Nothing in the statute contemplates that a voter is required to incur any costs in the execution of an affidavit.
Id. at 464-65. Therefore, the Michigan statute differed from the Wisconsin law because Act 23 requires elector *497 identification by presenting a government-issued photo identification and does not permit an elector to vote after signing an affidavit of identity at the polls.[13]
¶ 56. In City of Memphis v. Hargett, 414 S.W.3d 88 (Tenn. 2013), the Tennessee Supreme Court considered a Tennessee statute that required, with limited exceptions, electors to provide photographic proof of identity. Id. at 92. Under the Tennessee law, an elector who attempted to vote in person, but was unable to produce valid evidence of identification and did not fall within the exceptions to the law, may cast a provisional ballot, which would be counted if the voter presented valid proof of identity within two days after the election. Id. at 93.
¶ 57. Two voters presented non-compliant photo identifications issued by the City of Memphis and cast provisional ballots when their identifications were not accepted. Id. at 93-94. Those voters and the City then challenged the statute, bringing both facial and as-applied constitutional challenges. Id. at 94-95. In upholding the constitutionality of the Tennessee statute against the challenges, part of which contended that the law amounted to a de facto poll tax, the court pointed out that:
*498 [T]his state's Act contains an exception for any in-person voter who "is indigent and unable to obtain proof of identification without payment of a fee[.]" By its plain language, this provision exempts from the photo ID requirement any voter unable to pay the fees needed to obtain valid evidence of identification, including any fee associated with the documentation necessary to obtain a "free" photo ID card pursuant to section 55-50-336(g)(l). Because of this provision, we cannot endorse the Plaintiffs' characterization of the photo ID requirement as a poll tax.
Id. at 106 (emphasis added) (citation omitted). There, indigency operated as an exception to payment of direct and ancillary fees while preserving the right to vote.
¶ 58. In Crawford, the United States Supreme Court also mentioned ancillary fees. It noted that, "Indiana, like most States, charges a fee for obtaining a copy of one's birth certificate. This fee varies by county and is currently between $3 and $12." Crawford, 553 U.S. at 198 n.17. However, the Court did not consider whether an ancillary payment to an Indiana government agency in order to obtain a birth certificate was a de facto poll tax because "the record does not provide even a rough estimate of how many indigent voters lack copies of their birth certificates." Id. at 202 n.20. Additionally, indigent electors could avoid paying that fee by casting a provisional ballot and then executing an affidavit before the circuit court clerk within ten days of the election. Id. at 186.
¶ 59. The voter identification laws of Michigan, Tennessee and Indiana all included a provision by which a voter could cast a ballot without paying money to a government agency. Act 23 similarly provides that DOT "may not charge a fee to an applicant for the initial issuance, renewal, or reinstatement of an identification *499 card" when "the applicant requests that the identification card be provided without charge for purposes of voting." Wis. Stat. § 343.50(5)(a)3.
¶ 60. Requiring payment to a government agency to obtain a DOT photo identification card for voting puts the administrative regulation on a collision course with Act 23's directive that DOT "may not charge a fee." It also would he a severe burden on the right to vote.
¶ 61. Why is this burden severe? The usual payment of $20 for a certified copy of a birth certificate is modest and does not approach the sizeable costs parsed in other cases that bear on voting. See Lubin v. Panish, 415 U.S. 709, 710, 719 (1974) (concluding that $701.60 filing fee was unconstitutional); see also Bullock v. Carter, 405 U.S. 134, 145, 149 (1972) (explaining that a primary filing fee that at times reached $8,900 was constitutionally impermissible).
¶ 62. The modest fees for documents necessary to prove identity would be a severe burden on the constitutional right to vote not because they would be difficult for some to pay. Rather, they would be a severe burden because the State of Wisconsin may not enact a law that requires any elector, rich or poor, to pay a fee of any amount to a government agency as a precondition to the elector's exercising his or her constitutional right to vote. See Harper, 383 U.S. at 666 (concluding that the "payment of any fee [may not be] an electoral standard").[14]
*500 ¶ 63. Given our conclusion that it would be contrary to Act 23 and a severe burden on the right to vote if an elector were obligated to pay a fee to a government agency in order to obtain documents required for a DOT photo identification card to vote, we now consider whether a saving construction that is consistent with the statutory mandate and the Wisconsin constitution is possible.[15] If a saving construction of the administrative rule preserves the constitutionality of the statute, we will employ it. See McConnell v. Fed. Election Comm'n, 540 U.S. 93, 180 (2003) (concluding that where a saving construction is "fairly possible," the court will adopt it) (quoting Crowell v. Benson, 285 U.S. 22, 62 (1932)).
¶ 64. We do so in order to avoid a constitutional conflict. See, e.g., Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 503 (2001) (avoiding an interpretation of Fed. R. Civ. Pro. 41(b) that "would arguably violate the jurisdictional limitation of the Rules En *501 abling Act"). Stated otherwise, when we determine that there is a statutory flaw that may have constitutional significance, we ascertain whether the government rule or statute can be interpreted in a manner that will avoid a constitutional conflict. See State ex rel. Strykowski v. Wilkie, 81 Wis. 2d 491, 506, 261 N.W.2d 434 (1978). As the Supreme Court has explained, it is best to "limit the solution to the problem" rather than enjoining the application of an entire statute due to a limited flaw. Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 328-29 (2006).
¶ 65. Here, the potential to impose a severe burden on the right to vote is not stated in Act 23 itself. Rather, the flaw is in the administrative rules that DMV has applied to applicants for DOT photo identification cards to vote. Accordingly, we do not initially weigh the burden identified, i.e., the fees paid to government agencies to obtain documents that DMV has required prior to issuing DOT photo identification cards for voting, because a saving construction of the administrative rule must be considered first.
3. Saving construction
¶ 66. Wisconsin statutes and administrative regulations that address the same subject matter must be construed in a way that harmonizes them. Cnty. of Milwaukee v. Superior of Wisconsin, Inc., 2000 WI App 75, ¶ 21, 234 Wis. 2d 218, 610 N.W.2d 484. Here, Wis. Admin. Code § Trans 102.15(3)(a) requires documents for "Proof of Name and Date of Birth," that other statutes, such as Wis. Stat. § 69.22, require payment to provide. This creates a conflict with Act 23's directive to provide DOT photo identification cards for voting without charge.
*502 ¶ 67. However, DMV administrators have discretion under Wis. Admin. Code § Trans 102.15(3)(b) to excuse the failure to provide documents referenced in § Trans 102.15(3)(a) when DOT photo identification cards for voting are requested. Section Trans 102.15(3)(b) and (c) provide:
(b) If a person is unable to provide documentation under [§ Trans 102.15(3)](a), and the documents are unavailable to the person, the person may make a written petition to the administrator of the division of motor vehicles for an exception to the requirements of par. (a). The application shall include supporting documentation required by sub. (4) and:
1. A certification of the person's name, date of birth and current residence street address on the department's form;
2. An explanation of the circumstances by which the person is unable to provide any of the documents described in par. (a); and
3. Whatever documentation is available which states the person's name and date of birth.
(c) The administrator may delegate to the administrator's subordinates the authority to accept or reject such extraordinary proof of name and date of birth.
¶ 68. Because the exercise of a DMV administrator's discretion has constitutional ramifications when a DOT photo identification card for voting is requested, we note that we are obliged to choose the interpretation of Wis. Admin. Code § Trans 102.15(3)(b) that does not conflict with the Wisconsin Constitution. See Am. Family, 222 Wis. 2d at 667.
*503 ¶ 69. In order to harmonize the directive of Wis. Stat. § 343.50(5)(a)3., which says no fees; statutes such as Wis. Stat. § 69.22, which impose payment of fees; and Wis. Admin. Code § Trans 102.15(3)(a), which requires certain documents for which electors may be required to pay fees to government agencies, we construe § Trans 102.15(3)(b). We do so to preserve the constitutionality of § 343.50(5), as follows: One who petitions an administrator pursuant to § Trans 102.15(3)(b) for an exception is constitutionally "unable" to provide those documents and they are constitutionally "unavailable" to the petitioner within our interpretation of § Trans 102.13(3)(b), so long as petitioner does not have the documents and would be required to pay a government agency to obtain them.[16]
¶ 70. Stated otherwise, to invoke an administrator's discretion in the issuance of a DOT photo identification card to vote, an elector: (1) makes a written petition to a DMV administrator as directed by Wis. Admin. Code § Trans 102.15(3)(b) set forth above; (2) asserts he or she is "unable" to provide documents required by § Trans 102.15(3)(a) without paying a fee to a government agency to obtain them; (3) asserts those documents are "unavailable" without the payment of such a fee; and (4) asks for an exception to the provision of § Trans 102.15(3)(a) documents whereby proof of name and date of birth that have been provided are accepted. § Trans 102.15(3) (b) and (c). Upon receipt of a petition for an exception, the administrator, or his or her *504 designee, shall exercise his or her discretion in a constitutionally sufficient manner.[17]
¶ 71. We further conclude that filing a Wis. Admin. Code § Trans 102.15(3)(b) petition for an exception with a DMV administrator, as set forth above, is not a severe burden on the right to vote. Accordingly, because the burdens of time, inconvenience and costs upon electors' right to vote are not severe under our interpretation of § Trans 102.15, we apply a rational basis level of scrutiny in determining whether Act 23 is constitutional. Mary F.-R., 351 Wis. 2d 273, ¶ 35; Wagner, 263 Wis. 2d 709, ¶ 84. As the Supreme Court has explained, it is erroneous to assume that a law that regulates voting must be subject to strict scrutiny. Burdick, 504 U.S. at 432. Strict scrutiny applies only when a statute imposes a severe burden on the exercise of the franchise. Id. at 434.
D. State Interests
¶ 72. Defendants have identified state interests of protecting the integrity and reliability of the electoral process, maintaining public confidence in election results and preventing voter fraud as significant and compelling interests that underlie Act 23.
¶ 73. It should be beyond question that the State has a significant and compelling interest in protecting the integrity and reliability of the electoral process, as well as promoting the public's confidence in elections. Crawford, 553 U.S. at 196. As we learn of elections that *505 are currently occurring around the world in troubled nations, the integrity and reliability of the electoral process and the public's confidence in elections are always exceedingly important.[18]
¶ 74. The circuit court found there was no evidence of "recent" voter impersonation fraud in Wisconsin. However, that finding cannot overcome the State's interest in preventing voter fraud.[19] As the Supreme Court has held, "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." Purcell v. Gonzalez, 549 U.S. 1, 4 (2006).
¶ 75. We agree that the identified interests are significant and compelling. Id. (explaining that the "State indisputably has a compelling interest in preserving the integrity of its election process" (quoting Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 231 (1989) and that "[c]onfidence in the integrity of our electoral process is essential to the functioning of our participatory democracy"). However, because the burden on exercise of the franchise is not severe, the defendants need show only a legitimate state interest and that requiring elector identification by the use of a government-issued photo identification is a reasonable means of serving that interest. See *506 Wagner, 263 Wis. 2d 709, ¶¶ 77-78; Crawford, 553 U.S. at 196-97; 553 U.S. at 208 (Scalia, J., concurring); Burdick, 504 U.S. at 440.
¶ 76. We conclude that the use of Act 23-acceptable photo identification is a reasonable means of furthering the stated interests. It may help to assure the public that the electoral process is followed and that results of elections held in Wisconsin validly represent the will of the electors. In addition, those who would attempt to defraud the electors through misrepresentations to election officials will find that task more difficult.
III. CONCLUSION
¶ 77. We conclude that the burdens of time and inconvenience associated with obtaining Act 23-acceptable photo identification are not severe burdens on the right to vote and do not invalidate the law. The burdens of time and inconvenience of obtaining Act 23-acceptable photo identification are in many respects no more of an imposition than is casting an in-person ballot on election day. Furthermore, photo identification is a condition of our times where more and more personal interactions are being modernized to require proof of identity with a specified type of photo identification before proceeding.
¶ 78. However, to require payments to government agencies for documents necessary to obtain DOT photo identification cards for voting would severely burden the right to vote because it would condition that right on payment to a government agency. Act 23 explicitly prohibits payment to a government agency to obtain a DOT photo identification card for voting.
¶ 79. The payments at issue arise under Wisconsin administrative rules that implement Act 23. Therefore, *507 we construed those rules and explained how the discretion of the DMV administrator must be exercised in a constitutionally sufficient manner. Such exercise of discretion requires the issuance of DOT photo identification cards for voting without requiring documents for which a fee continues to be charged by a government agency. In so doing, we employ a saving construction of Wis. Admin. Code § Trans 102.15(3)(b) and relieve the severe burden that would otherwise exist due to costs levied by government agencies.
¶ 80. Because Act 23 does not place a severe burden on the exercise of the franchise, we apply rational basis scrutiny and conclude that Act 23 is reasonably related to the State's significant interests. Accordingly, we reverse the judgment of the circuit court and vacate all injunctions the court issued.
By the Court-The judgment of the circuit court is reversed and the permanent and temporary injunctions are vacated.

 The Honorable David T. Flanagan, III presided.

 Article III, Section 1 provides:
Electors. Section 1. Every United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district.
In their complaint, plaintiffs alleged that Act 23 also violated Article I, Section 1 of the Wisconsin Constitution, which guarantees equal protection and due process under the law in a manner similar to the Fourteenth Amendment to the United States Constitution. In their brief to us, plaintiffs refer only to Article III, Section 1 of the Wisconsin Constitution. However, they also contend that there is "a single standard to apply to all challenges to restrictive voting laws, whether *475 brought as equal protection and due process challenges or under the fundamental right to vote," and their arguments are in most respects consistent with arguments made in due process and equal protection challenges.

 All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

 We address only the financial burden incurred while obtaining a DOT photo identification card for voting, see Wis. Stat. § 343.50, because the other forms of Act 23-acceptable identification are required for purposes other than voting, e.g., driver licenses are required to lawfully drive a vehicle.

 Put simply, the right to vote cannot require payment to a government or its agencies. This includes, of course, a "poll tax," where a government directly requires and itself collects a payment in order to vote. See Harper v. Va. Bd. of Elections, 383 U.S. 663 (1966). It also includes, however, fees that a government agency other than a Wisconsin agency may charge for documents necessary to obtain a DOT photo identification card for voting. We cannot require other governments or their agencies to refrain from charging such fees. We can, however, explain that in order to constitutionally administer Act 23, the DMV may not require documents in order to issue a DOT photo identification card for voting that require payment of a fee to any government agency.

 Wisconsin Stat. § 69.22(6) provides that the "register of deeds may provide free searches and free copies [of vital records] to agencies in his or her county at the direction of the county board." However, there is no mention in § 69.22 of providing free certified copies of birth certificates or other vital records that have been required to obtain DOT photo identification cards to vote.

 We note that the District Court for the Eastern District of Wisconsin declared that Act 23 violated the federal constitution in Frank v. Walker, 17 F. Supp. 3d 837 Nos. 11CV1128 and 12CV185, 2014 WL1775432 (E.D. Wis. Apr. 29, 2014). The court did so knowing that the question of whether the voter identification law is constitutional was before us. Id. at *42 n.l. Federal court interpretation of a state statute prior to precedential state court interpretation is most unusual because if a saving construction by the state court is possible, then facial invalidation of the statute is inappropriate. See, e.g., Harrison v. NAACP, 360 U.S. 167, 176 (1959) (concluding that "no principle has found *482 more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them"). This is known as "Pullman abstention." See R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 499-500 (1941).
Pullman abstention requires federal courts to abstain from deciding an unclear area of state law that raises constitutional issues because state court clarification might serve to avoid a federal constitutional ruling.. . . [Flederal courts should retain jurisdiction over the case, but stay the proceedings so that state courts can rule on the state law question. If the state court fails to resolve the issue, however, the parties may then return to federal court for a ruling on the constitutional issue.
Nivens v. Gilchrist, 444 F.3d 237, 245-46 (4th Cir. 2006) (citation omitted).

 We note that Judge Wagner's due process and equal protection claims under the Wisconsin Constitution related to Article I, Section 1 of the Wisconsin Constitution and that plaintiffs' challenge to Act 23 is based on Article III, Section 1 of the Wisconsin Constitution. However, the method of analysis of burdens employed in Wagner v. Milwaukee Cnty. Election Comm'n, 2003 WI 103, 263 Wis. 2d 709, 666 N.W.2d 816, is appropriate here too.

 In Frank, the district court repeatedly cited to Anderson v. Celebrezze, 460 U.S. 780 (1983) and Burdick v. Takushi, 504 U.S. 428 (1992), but it did not follow the legal standard those cases provide. Frank, Nos. 11CV1128 and 12CV185, 2014 WL 1775432, at *5. The district court did not employ the Anderson/Burdick analytic framework because the court did not first determine whether the Wisconsin act severely burdened exercise of the franchise. Id. at *6. Rather, the court merely concluded that the act placed an "unjustified" burden on the right to vote. Id. at *18. It arrived at its conclusion by first deciding that Walker had failed to prove the significance of the State's interests. Id. at *6-11. Because the State's interests were not significant, the district court concluded that the burden was "unjustified." Id. at *18.
The district court's reasoning stands the Anderson/Burdick analysis on its head. Anderson and Burdick require that the statutory challenger first prove whether the burden on the franchise is severe because it is this initial determination about the severity of the burden that drives the level of scrutiny *491 courts then apply to the State's asserted interests. Burdick, 504 U.S. at 434, 440; see also Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 190 (2008); id. at 205 (Scalia, J., concurring). It is only when a statute imposes a severe burden on the right to vote that the State's asserted interests are subject to strict scrutiny. Burdick, 504 U.S. at 434. Accordingly, Frank provides no guidance as we address plaintiffs' claims.

 The REAL ID Act also applies to those ID cards for boarding commercially operated airline flights, entering federal buildings and nuclear power plants. It does not apply to DOT photo identification cards issued for use in voting.

 While our focus is on DOT issued photo identification cards, we note that some of those who testified had obtained a Wisconsin driver's license. Any payments to Wisconsin government agencies in order to obtain a driver's license are not relevant to our discussion because that license confirms the privilege to drive; it is not obtained solely for elector identification.

 Copies of other vital records, Wis. Stat. § 69.21, may also have been required. For convenience of discussion, we refer only to birth certificates.

 The affidavit alternative available to Michigan electors provides:
If the elector does not have an official state identification card, operator's or chauffeur's license as required in this subsection, or other generally recognized picture identification card, the individual shall sign an affidavit to that effect before an election inspector and be allowed to vote as otherwise provided in this act.
In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71, 740 N.W.2d 444, 451 (Mich. 2007) (quoting Mich. Comp. Laws § 168.523).

 Although Harper was based on the United States Constitution, Wisconsin's protection of the right to vote is even stronger because in addition to the equal protection and due process protections of Article I, Section 1 of the Wisconsin Constitution, the franchise for Wisconsin voters is expressly declared in Article III, Section 1 of the Wisconsin Constitution.

 We have broad subject matter jurisdiction as a "court of last resort on all judicial questions under the constitution and laws of the state; a court of first resort on all judicial questions affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people." Attorney Gen. v. Chicago & Nw. Ry. Co., 35 Wis. 425, 518 (1874).
It is true that courts may lack subject matter jurisdiction to review administrative agency decisions if the petition for review is not timely filed. Schiller v. DILHR, 103 Wis. 2d 353, 355, 309 N.W.2d 5 (Ct. App. 1981) (concluding that circuit court lacked subject matter jurisdiction to review LIRC decision because petition was not timely filed); Kegonsa Joint Sanitary Dist. v. City of Stoughton, 87 Wis. 2d 131, 150, 274 N.W.2d 598 (1979) (same). However, this line of cases has nothing to do with the issues presented in this appeal.

 Our ruling in this regard applies to the provision of an elector's initial, renewal and reinstatement of a DOT photo identification card. It does not apply to replacements for DOT photo identification cards that have been lost or misplaced.

 We do not address the straw man of personal jurisdiction because it is not the DMV administrator's rights that are at issue in this lawsuit. It is the electors' constitutional right to vote.

 A recent filing in Milwaukee County demonstrates that voter fraud is a concern. See State v. Monroe, 2014CF2625 (June 20, 2014), wherein the Milwaukee County District Attorney's office filed a criminal complaint against Robert Monroe that alleged 13 counts of voter fraud, including multiple voting in elections and providing false information to election officials in order to vote.

 We note that Wisconsin was one of the states identified in Crawford, where there is a record of voter fraud having occurred. Crawford, 553 U.S. at 195 n.12.